Mark A. Romeo, Bar No. 173007
mromeo@littler.com
Derek S. Hecht, Bar No. 273039
dhecht@littler.com
Ariën Koorn, Bar No. 276758
akoorn@littler.com
LITTLER MENDELSON P.C.
18565 Jamboree Road
Suite 800
Irvine, California 92612
Telephone:   949.705.3000
Fax No.:      949.724.1201

Attorneys for Plaintiff
GALDERMA LABORATORIES, L.P.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GALDERMA LABORATORIES, L.P., | Case No. 2:23-cv-02879 |
| Plaintiff, | **COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF FOR:** |
| v. | |
| REVANCE THERAPEUTICS, INC. | **(1) VIOLATION OF THE CALIFORNIA UNIFORM TRADE SECRET ACT;** |
| Defendant. | |
| | **(2) VIOLATION OF THE DEFEND TRADE SECRETS ACT;** |
| | **(3) INDUCING BREACH OF CONTRACT;** |
| | **(4) INTERFERENCE WITH CONTRACTUAL RELATIONS; and** |
| | **(5) AIDING AND ABETTING A VIOLATION OF PENAL CODE 502(c)** |
| | **DEMAND FOR JURY TRIAL** |

**NATURE OF THE CASE**

1.    This is an action based upon: (1) misappropriation of trade secrets under California's Uniform Trade Secrets Act (Cal. Civ. Code § 3246, *et seq.*); (2) misappropriation of trade secrets under the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*); (3) inducing breach of contract; (4) interference with contractual relations; and (5) aiding and abetting a violation of California Penal Code Section 502(c).

**THE PARTIES**

2.    Plaintiff Galderma Laboratories, L.P. ("Galderma" or "Plaintiff") is a Texas limited partnership, with its principal place of business and headquarters at 14501 North Freeway, Fort Worth, Texas 76177.  Therefore, Galderma is a citizen of Texas.

3.    Defendant Revance Therapeutics, Inc. ("Revance" or "Defendant") is a publicly held Delaware corporation, with its principal place of business and headquarters in Nashville, Tennessee.  Galderma is informed and believes and thus alleges that Revance's principal offices are located at 1222 Demonbreun St., Suite 2000, Nashville, TN 37203.  Revance is a direct competitor with Galderma.

**JURISDICTION**

4.    This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. section 1836(c) and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. Section 1367.  In addition, there is a separate basis for jurisdiction in that complete diversity exists between Galderma and Defendant.  *See* 28 U.S.C. § 1332.  Venue is proper in the Central District because the wrongful acts described in this Complaint occurred primarily in Los Angeles County.

COMPLAINT

## GALDERMA AND ITS BUSINESS

5.      Galderma is a pharmaceutical company specializing in the research, development and marketing of dermatological treatments. To that end, Galderma utilizes its decades of experience, innovative techniques, and unique heritage in hyaluronic acid fillers and botulinum toxin to develop new aesthetic solutions to help patients look and feel their best, and Galderma aims to be a premier partner of choice for healthcare professionals. In addition to providing a reliable and trusted portfolio of products that provide patients the results they want, healthcare professionals choose to work with Galderma because of the proven quality of its brands, unwavering commitment to pioneering science and practice support, and its extraordinary depth of expertise and unique heritage in skin health.

6.      Galderma's business requires its sales professionals to create product demand within their assigned territories by promoting Galderma's products to current and potential customers within a defined geographic territory through a variety of means, including developing and coordinating physician training programs and practice enhancement in-services and open houses. Sales professionals are also expected to provide technical product and procedure expertise to healthcare professionals. Given the nature of Galderma's business, sales professionals actively participate in regularly scheduled company sales meetings, as well as district and regional conference calls and other business meetings to discuss customers, products, and sales strategies. Given the very important nature of this work, Galderma has invested considerable time, expense, and resources in its employees—including Tisckos—to equip them to interface with Galderma's customers and sell its products competently and credibly.

7.      In the course of conducting its business, Galderma has also invested substantial time, expense, and resources to build its reputation, image, and relationships with customers, suppliers, vendors, and business contacts. It has further

established a valuable and substantial business reputation and positive trade and patronage.

## GALDERMA'S CONFIDENTIAL AND TRADE SECRET INFORMATION

### Galderma Has Developed Numerous Trade Secrets and Maintains Other Valuable, Confidential Information

8.    Galderma has invested years of time and hundreds of millions of dollars developing the technologies and trade secrets, including but not limited to information related to: confidential customer purchasing histories, preferences, and practices; pricing, incentive, and contract terms; sales and marketing strategies leveraged to differentiate Galderma from its competitors within the marketplace; and Galderma's competitive strengths and weaknesses.

9.    Galderma has expended and continues to expend considerable resources to: (a) develop competitive and unique aesthetic solutions; (b) pioneer and introduce aesthetic solutions with competitive and profitable pricing strategies; (c) identify and solicit potential clients; (d) market its brand and foster client goodwill; and (e) train, motivate, and develop its salesforce.  Individuals employed by Galderma who are engaged in sales, especially those with access to Galderma's sales and pricing strategies—such as Tisckos—become intimately knowledgeable of Galderma's products, business, transactional data regarding customers, and Galderma's cost and profit margins for each client.

10.    Galderma's trade secrets and confidential information have significant economic value to Galderma's competitors. Therefore, Galderma has a legitimate business interest in keeping such information confidential, in maintaining its customer relationships, and in not allowing the information to be disclosed to competitors (including Revance) through improper means.

11.    Giving a competitor or other third party access to these trade secrets would result in irreparable harm to Galderma by, for example, allowing its competitors to reap the benefits of the years and hundreds of millions of dollars

expended by Galderma to develop and maintain that information, and to do so without investing the time, effort, and resources that Galderma did.  In particular, the information taken by Defendants would allow Revance to quickly build a salesforce and identify key markets and customers to target.

**Galderma's Efforts to Protect Its Confidential and Trade Secret Information**

12.    Galderma takes the protection of its information very seriously and expends a considerable amount of time and money to keep its information secure.  At all relevant times, Galderma has taken extensive and reasonable steps to protect the confidentiality of its trade secrets and other confidential information.  This includes:

    a.  Storing Galderma's confidential information on secured and password-protected electronic systems, which are accessible only to Galderma personnel or other authorized parties.

    b.  Individuals who use Galderma's computer system are required to use passwords to access the system.

    c.  Galderma's IT department regularly conducts security audits to ensure the safety of Galderma confidential information.

    d.  Galderma's Code of Conduct contains provisions concerning the protection of Galderma's confidential and proprietary information, the use of Galderma's computer systems, and the monitoring of that use by Galderma's IT department.  It also requires that employees "return all property belonging to the Company on or before the last date of employment"; prohibits employees from using or attempting to use Company property, or any other property on Company premises, for any purpose other than that for which it was intended and for which they have authorization; and prohibits employees from removing or attempting to remove any article or articles which are Company property, or any individual's property kept on Company

premises, without authorization from their manager or the individual respectively;

e. Galderma's Compliance Manual provides that "[a]ll messages created, sent, or retrieved using the Company's electronic communications are the property of the Company and should be considered Company information."

f. Galderma only allows certain employees to access drives containing some of its most confidential information.

g. Galderma's Charter for the Use of IT Resources prohibits users from "misus[ing] for their own personal gain or that of a third party, any IT resource to which they have access" (with IT Resource being defined to include: hardware (computers, mobile devices, printers, phones and computer networks) and software (e-mail, applications, systems); prohibits users from "download[ing] Company data on a personal IT Device" (defined to include computers, smart phone, thumb drives, web browser and/or cloud-based storage); requires users to "return all IT Devices provided by the Company when leaving the Company"; prohibits users from "mak[ing] unauthorized modifications to any of the contents [of an IT resource], including deleting or changing data"; prohibits users from "systematically forward[ing] Company emails to personal email accounts"; states that users must "never transmit…Company confidential information via the Internet without the proper technical and legal safeguards/approvals being in place beforehand."

h. Galderma's Non-Disclosure, Non-Competition and Non-Solicitation Agreement ("Galderma's NDA" or the "NDA") provides in the first paragraph that each employee "shall comply

with all instructions, rules, policies, regulations and procedures of the Company, including the Employee Handbook and Code of Conduct" and that each employee "agrees to act at all times in accordance with high business and ethical standards." A true and correct copy of the Galderma NDA is attached as **Exhibit 1**.

13.    By virtue of his employment with Galderma in his role as a Senior Account Manager, Tisckos was given access to and did utilize Galderma's confidential information in his sales efforts and ongoing efforts to build upon Galderma's customer relationships. In exchange for the access to that information, Tisckos agreed that he would not:

> "directly or indirectly, use for [his] own account, use in any way or for any other purpose, disclose to anyone, publish, exploit, destroy, copy or remove from the offices of the Company, nor solicit, allow or assist another person or entity to use, disclose, publish, exploit, destroy, copy or remove from the offices of the Company, any Confidential Information or part thereof, except: (1) as permitted in the proper performance of [his] duties for the Company; (2) as permitted in the ordinary course of the Company's business for the benefit of the Company…"

Galderma NDA at Sec. 3(b).

14.    Tisckos also promised that he would not: "remove, destroy, …, damage or delete any Property of the Company." NDA at Sec. 3(b)(v).

15.    Tisckos was also obligated to return all Galderma Property "upon the termination of [his] employment …." Galderma NDA at Sec. 3(f); *see also id.* at Sec. 3(b) ("Confidential Information prepared or compiled by Employee and/or the Company or furnished to Employee during Employee's employment with the Company shall be the sole and exclusive property of the Company, and none of such Confidential Information or copies thereof, shall be retained by Employee.").

16.    Additionally, Tisckos promised that after he returned all Galderma Property to Galderma upon the termination of his employment he would

1   "immediately destroy any information or documents, whether prepared by Employee

2   or others, containing or reflecting any Confidential Information or relating to the

3   business of the Company from any computer, cellular phone or other digital or

4   electronic device in Employee's possession, custody or control, and Employee shall

5   certify such destruction in writing to the Company."  Galderma NDA at Sec. 3(f).

6   Likewise, Tisckos promised that in case he or the Company determined that he was

7   in possession, custody, or control of any Galderma property, he would "immediately

8   return all such Property, including all copies and portions thereof, to the Company."

9   Lastly, Tisckos promised that "[u]pon request by the Company, Employee shall

10   provide such computer, cellular phone or other digital or electronic device to the

11   Company or the Company's designee for inspection to confirm that such information

12   and documents have been destroyed."  *Id.*

13                    **TISCKOS' EMPLOYMENT WITH GALDERMA**

14          17.    In July 2014, Galderma hired Defendant Chad Tisckos.  At the time of

15   his resignation from Galderma, Tisckos was employed as a Senior Account Manager

16   representing Galderma's Aesthetics business.   As a Galderma Senior Account

17   Manager, Tisckos' job duties included promoting and selling products to current and

18   potential customers within a defined territory.  Key activities included face-to-face

19   sales calls with medical professionals and initiating specific courses of action to

20   increase sales and market share for specific products.  Tisckos' responsibilities also

21   required him to optimize potential sales and to strengthen client relationships.

22          18.    At the time of his separation from Galderma, Tisckos' assigned territory

23   was "Beverly Hills South."   Tisckos did not have any territory or customers in

24   Pasadena.

25          19.    While employed by Galderma, Tisckos acquired substantial knowledge

26   of Galderma's competitively sensitive confidential information and trade secrets

27   listed herein.

28

**TISCKOS RESIGNS AND ACCEPTS EMPLOYMENT WITH REVANCE, A
DIRECT COMPETITOR**

20.    On April 1, 2021, without any prior notice, and after **twice** denying that he was planning to do so, Tisckos resigned from Galderma, effective at 5:00 p.m. the same day (April 1st).

21.    At the time, Galderma did not know that Tisckos had accepted employment with Revance, a direct competitor of Galderma.

22.    In fact, Tisckos had accepted a position with Revance on or about March 8, 2021, and he had been in discussions with Revance about a potential position since on or about January 2021.  He had been actively interviewing with Revance since, at the latest, February 2021.

23.    According to Revance, during the interview process, Tisckos and Revance discussed how to move Galderma's customers to Revance.  Specifically, during the interview process and while Tisckos was still employed by Galderma, Tisckos and Revance discussed how Tisckos could use his contacts to help Revance's Beverly Hills salespeople obtain business from Galderma's customers.

24.    Tisckos concealed his planned departure to Revance from Galderma.  In particular, Tisckos was asked in February 2021 if he was interviewing with Revance. He denied it, stating he had no intention of going to Revance.  He was then asked again on or about March 25, 2021 if he was going to Revance.  Despite the fact that Tisckos had already accepted a position with Revance, Tisckos again denied that he was going to Revance and again affirmed his commitment to Galderma.

25.    Even after he left Galderma, Tisckos continued the deception about his move to Revance.  In an exit interview conducted on or about April 13, 2021, Tisckos falsely told Galderma that he was **not** going to a competitor, even though by that point he was **already working** for Revance.  In fact, Tisckos' employment with Revance started on **April 1, 2021**, meaning that Tisckos was working for (and being paid by) Revance at the same time he was working for and being paid by Galderma.

26. Tisckos asked Revance to keep his interviews with them confidential. Similarly, in the course of soliciting his former Galderma customers on behalf of Revance, Tisckos requested that they too keep his move to Revance confidential. As set forth below, this deception was important to Tisckos and Revance because it allowed Tisckos to continue to exploit Galderma's confidential information on these customers and to continue to help Revance usurp Galderma's customers.

27. During Revance's recruitment of Tisckos, Revance provided Tisckos with a "New Hire Checklist" that Tisckos signed and initialed nine times on March 13, 2021. A true and correct copy of this checklist is attached as **Exhibit 2.** In that checklist, Tisckos "verified" that he had searched for all Galderma information (including through electronic devices and email), that he had returned it all, that he no longer had access to it, and that he did not have any in his possession.

28. As Tisckos has now acknowledged under oath,[1] those representations were false. Moreover, Revance must have known they were false because Revance was aware that, as of March 13, 2021, Tisckos was still employed by Galderma. Revance was aware that Tisckos was not expected to start work for Revance until April 1, 2021 (Tisckos' original start date was March 22, 2021, which he asked to delay so he could continue to communicate with Galderma's customers) and that Tisckos was concealing his upcoming departure from Galderma. Plainly, the entire agreement was a smokescreen intended to hide Tisckos' misconduct and provide Revance with cover if Tisckos' theft came to light. Revance plainly did not care if Tisckos' representations were true (and Revance must have known they were not), and Revance took no disciplinary or remedial action against Tisckos for his numerous, willful misstatements, even after learning the statements were false, further demonstrating that Revance already knew the statements were false and did not care.

---

[1] As referenced herein, Galderma has pursued litigation separately against Tisckos, and that case is currently pending in the Central District of California.

29.    As set forth below, Revance provided additional cover to Tisckos after Galderma notified Revance of Tisckos' theft of Galderma's information, falsely claiming that Tisckos did not have any Galderma information and that he could not use it because he was working in a different sales territory.

### DEFENDANT'S WRONGDOING

30.    After his employment with Galderma ended, Tisckos was obligated to return all Galderma property pursuant to the Galderma NDA.  Galderma NDA at §§ 3(b), 3(f).   Tisckos breached this obligation.   During his employment with Galderma, Tisckos was given an HP Elitebook 820 G3 laptop computer (the "Galderma Laptop").   Tisckos also had a Galderma-issued iPad that he used to perform work for Galderma.  It was not until on or about April 16, 2021, however, that Tisckos returned the Galderma Laptop and iPad.  Tisckos claimed that he needed this extra time to return Galderma's devices because he was traveling, and Galderma accepted this explanation as being truthful.  Because Tisckos concealed his new employment with Revance from Galderma, Galderma did not know that as of April 1st Tisckos had already obtained a new computer and iPad from Revance and that Tisckos was using those devices to perform work on behalf of Revance.  Tisckos had and used both sets of devices for weeks.

31.    In addition, Tisckos maintained a significant amount of Galderma confidential information on his phone, including Galderma's customer contact information.  Tisckos continued to use that phone for Revance work purposes after starting work for Revance.  Tisckos also maintained Galderma information on his personal cloud-storage accounts, which he likewise concealed from Galderma.  Had Galderma known that Tisckos was working for a direct competitor and had access to its electronic devices and accounts, Galderma would have never let Tisckos retain its devices for any period of time post-employment, regardless of whether he was actually traveling for personal reasons, as he claimed.

32.    On information and belief, Revance took no steps to prevent Tisckos from using Galderma's information or to prevent Tisckos from using devices containing Galderma's information while employed by Revance.  While Revance had Tisckos sign agreements saying he would not use former employer information, as set forth above Revance knew or should have known that Tisckos was not being truthful when he signed them, and Revance took no disciplinary action against Tisckos for these falsehoods.

33.    In light of Tisckos' failure to timely return his Galderma Laptop, and after learning that Tisckos was going to work for a direct competitor, Galderma retained a prominent third-party forensics firm to examine the Galderma Laptop. Based on the examination, and to Galderma's surprise and disappointment, Galderma learned that Tisckos engaged in the following wrongful acts:

a.  Continuing to use the Galderma Laptop between the last date of his employment with Galderma, April 1, 2021, and April 16, 2021 (during which time he was already working for Revance).

b.  Removing the administrator profile from his Galderma-issued iPad, which rendered the device unreviewable, and failing to provide the password to the iPad to allow Galderma to unlock the device.  Tisckos claimed he could not remember that password, even though he admitted frequently entering the password during his employment with Galderma and was asked for it shortly after his employment with Galderma ended.

c.  Forwarding to his personal email account, in the months leading up to his separation from Galderma, **hundreds** of Galderma emails, many of which contained confidential and proprietary Galderma information.  For example, on December 30, 2020, over the course of five hours, Tisckos forwarded 115 emails to his personal email address, including emails containing

documents containing Galderma's sales, territory, and customer information. Notably, on January 8, 2021, Tisckos forwarded to himself a spreadsheet titled "███████████████████." That spreadsheet lists each of Tisckos' Galderma customers and contact information for those customers, as well as Galderma's sales to each of those customers broken down by product type, and opportunity information about each customer (including an overall estimated opportunity value for each of these customers). Documents recently produced by Revance (which contradict Revance's and Tisckos' sworn testimony otherwise) show that immediately after Tisckos joined Revance he began soliciting many of the customers on this spreadsheet, apparently focusing on those with high estimated opportunity values.

d. Retaining the Galderma Laptop in his possession until April 16, 2021, despite promising to return it "immediately" "upon the termination of [his] employment for any reason."

e. On March 9, 2021, **the day after accepting employment with Revance**, downloading a number of highly sensitive and confidential Galderma documents from Galderma's Box.com account (a web-based data storage account to be used to further Galderma's business interests). These documents were **not** downloaded to Tisckos' Galderma-issued laptop, and Tisckos has failed to identify the device he downloaded them to. Tisckos retained in his possession and failed to return upon his departure from Galderma versions of certain files Tisckos downloaded on March 9th. Those files are highly confidential and contain information regarding Galderma's promotions, including customer and sales data related to such promotions.

COMPLAINT

f. On March 31, 2021, **the day before he resigned from Galderma**, downloading the following 10 Galderma files from the Galderma Box.com account, which, as noted below, contain a significant amount of confidential customer and prospective customer-based data, including sales information. Tisckos retained in his possession and failed to return to Galderma upon the termination of his employment versions of certain of these files:

g. Connecting an iXpand Flash Drive USB Device (the "USB Device") to the Galderma Laptop and then between February 27, 2021 and March 1, 2021, copying and/or exploring a number of confidential and proprietary Galderma files, including, without limitation, one titled "Copy of ███████████████ ███████." Significantly, this particular Excel-based file contains Galderma ██████████████████████████████ ███████████████████████████████. These files are custom built by ███████████████ and sent frequently to the individual sales representatives (subject to their duty to maintain the confidentiality of these files as per the NDA they have signed as a condition of holding employment with Galderma). This ████████ is a customized tool ███████

COMPLAINT

for its salesforce to give them an advantage ███████. ████████. This allows Galderma's salesforce to ████████████████. This ████████ tool would be very valuable for another dermatology pharmaceutical sales ████████ team to copy, and for a sales representative to use to run their business at another company. ████████ builds these files and then each representative can upload their ████████ into the file. A competitor would be unjustly enriched if someone gave this ████████ to them. Tisckos took this information from Galderma's confidential and proprietary database that he had to have a password and username to access.

h. Engaging in a massive deletion and then purging of confidential and proprietary Galderma data from his Galderma Laptop on April 16, 2021. As noted above, this was **15 days after Tisckos' last day of employment with Galderma**, and Galderma's investigation reveals that Tisckos systematically selected specific files to delete and then purge. On information and belief, Tisckos took these actions to cover up his wrongdoing. In all, Tisckos deleted 873 files from his Galderma user account titled "ustisckoch" and from the path "users\ustickoch\desktop."

34. Regarding the files in the table listed above, Galderma has a unique "Collaboration Program." Galderma began developing its Collaborations Programs in 2014 and has been developing and refining it since that time. It has taken Galderma years to perfect its approach to conducting these Collaborations. This program is very disruptive to the marketplace in Galderma's favor. Two of Galderma's competitors, Allergan and Merz, own their own skincare lines: Skin Medica, and Neocutis, respectively. Rather than buy a skincare company or line, Galderma chooses to engage in Collaborations. Newer competitors (such as Revance, Endo

and Evolus) would love to know who Galderma partners with, who is taking advantage of these Collaborations, and how much Galderma sells through the Collaborations, among other things.

35.    The seven (7) files identified below are from Collaborations – consumer activity reports:



36.    The above-referenced seven files show Galderma's ███████ account numbers, ██████████████████████████████████████████████████████████████ ███████████. They are all highly confidential. Galderma does not even give its sales representatives (like Tiscko s) access to these files; only managers and above have access.  However, to further Galderma's business interests, managers will sometimes share a file with their representatives.  Galderma is informed and believes and therefore alleges that Tiscko s received these files from his manager(s).  Tiscko s, however, certainly should not have been downloading the same as he did just one day before he resigned.

37.    The remaining three (3) files listed in the matrix above are known as "Promotional" files.  They show all the data related to which customers are purchasing and selling Galderma's Promotions.  They also show who is receiving "ASPIRE" codes from Galderma – i.e., codes related to Galderma's consumer loyalty program.  This is extremely confidential to Galderma's ASPIRE loyalty program, which is a competitive advantage to Galderma.  Each of these files is highly confidential and not shared with anyone outside of Galderma.  Galderma's Marketing team has taken years and millions of dollars to perfect Galderma's loyalty program

and the way it uses ASPIRE codes to help drive consumers into Galderma's customer offices. This helps Galderma with repeat treatments and loyalty. This is a very significant advantage in favor of Galderma. Only Galderma and Allergan have loyalty programs of this magnitude. Sharing this data is very damaging to Galderma.

38.    The three (3) files identified below are from Marketing promotions:



39.    With the information contained in these files, a competitor would know Galderma's structure, its top sales representatives, where it has business opportunities and its salesforce. A person taking these files could use them to recruit Galderma's employees and build out a salesforce of their own, among other things. This information would be especially useful to a company like Revance which, in early 2021, was new in the aesthetics industry and was looking to rapidly expand its workforce and reach.

40.    In addition to the above-identified misconduct, Galderma also recently learned that Tisckos took Galderma information **after** his employment with Galderma ended. In particular, Tisckos took a screenshot of a Galderma document on April 2, 2021, the day **after** he resigned from Galderma, and forwarded it to his personal email address. Tisckos was not a Galderma employee and was not authorized to access or take Galderma information at the time he did this, and he had no legitimate Galderma business reason for doing so.

41.    The timing of these actions shows that Tisckos was taking information to benefit Revance, including Tisckos' theft of information the day after he accepted a position with Revance.

42.    Further, Tisckos took information specifically to benefit Revance. Tisckos approached Galderma's sales representative responsible for Pasadena and asked her for information on her sales and customers, claiming it was for Galderma business purposes. It was not. Tisckos also took considerable information about

Galderma's Beverly Hills customers, including contact information, sales histories, and opportunities.  Tisckos then worked closely with Revance's Beverly Hills sales representative to solicit business from these customers, and it appears his solicitations were targeted to high-value, vulnerable customers.  Importantly, Tisckos was unable to say how he obtained the contact information for these customers, but admitted he kept that information on the mobile phone he used for work while at Galderma and continued to use at Revance.

**TISCKOS PAYS LIP SERVICE TO GALDERMA'S ATTEMPTS TO GET ITS INFORMATION BACK AND REVANCE IGNORES GALDERMA'S ATTEMPT TO HAVE IT INVESTIGATE TISCKOS' MISCONDUCT**

43.    On June 3, 2021, Galderma wrote to Tisckos laying out the findings from the third-party forensics firm it had examine the Galderma Laptop.  Galderma asked Tisckos to cooperate with Galderma, including, without limitation:

> a.  Immediately turning over to Galderma any and all of Galderma's confidential and proprietary information that was in his possession, custody, or control;
>
> b.  Making all of the personal electronic data storage system(s) and/or personal computer(s), including but not limited to computers, hard drives, USB storage devices, cloud based data storage systems, smart phones, and any other electronic storage device(s) in his possession, custody or control (together with log-ons and passwords for each), available to an independent third party forensic analyst, who would create a forensic image to (i) preserve data;  (ii) verify if he was in possession, custody, or control of Galderma confidential and proprietary information, and (iii) determine any and all uses, copies, or transmissions of such data while in his control or custody; and

COMPLAINT

      c.  Submit to an interview by Galderma for the purpose of determining where all Galderma's proprietary information was being stored, and whether it had been shared with or used by anyone outside of the Galderma organization, including, for example, Revance.

44.    Galderma asked Tisckos to respond to its letter on or before June 7, 2021. That same day (June 3, 2021), Galderma also sent a letter to Revance, to the attention of its General Counsel, outlining in detail the wrongdoing committed by Tisckos and asking for Revance's cooperation in determining what Galderma information, if any, had already made its way to Revance's systems and/or been used by Tisckos in furthering the business interests of Revance.

45.    Tisckos did not timely respond to Galderma's June 3rd letter. Instead, Tisckos waited until June 9, 2021 to send an incomprehensible email to Galderma's counsel.

46.    In that response, Tisckos failed to address the accusations of wrongdoing that were uncovered by computer forensics, and failed to address Galderma's request that he cooperate with it to ensure that its information in his possession, custody, or control was returned and was not used by him or others to further the business interests of Revance, or another person or entity that competes with Galderma. Notably, he failed to tell Galderma that he had taken and failed to return Galderma trade secrets and other confidential information.

47.    On June 22, 2021, Revance responded to Galderma's letter. In its response, Revance claimed, "[w]e performed our own forensic examination and did not find any Galderma information on Revance systems and/or cloud-based storage." Revance further stated, "[I]t was determined that [Tisckos] has not used or disclosed any Galderma information and has not transferred or copied such to any Revance system."

19

COMPLAINT

48.    Despite its express representations, it appears Revance **did not** conduct a competent investigation or examination to determine if Tisckos possessed or used Galderma information.  In fact, Tisckos retained Galderma information in numerous locations, including on the phone he used for Revance work purposes and on electronic accounts he accessed from his Revance-issued computer.  Any competent investigation would have found this.  Revance has refused to identify any of the steps it took in this alleged investigation/examination, even when asked to do so under oath.  Revance has not stated what devices or accounts it searched or how it searched them.  It refused to disclose the findings.

**TISCKOS DISCLOSES GALDERMA'S CONFIDENTIAL AND TRADE SECRET INFORMATION TO REVANCE AND REVANCE CONCEALS TISCKOS' RETENTION, DISCLOSURE, AND USE OF GALDERMA INFORMATION**

49.    On October 13, 2022, in litigation between Tisckos and Galderma, Galderma took the 30(b)(6) deposition of Robert Jones ("Jones"), Revance's Vice President of U.S. Aesthetic Sales.  During his deposition, Jones repeatedly stated that Revance had performed an internal investigation and determined that no Galderma information had been used. However, he would not or could not provide any information on how the investigation was carried out or what its results revealed.

50.    However, Mr. Jones made several sweeping claims about Tisckos' work for Revance. When asked if Tisckos had ever done business for Revance in Beverly Hills, Jones said "no."  When asked if Revance had communications with Tisckos about "Galderma customers, prospective customers, and/or relationships," Jones replied, "We did an investigation, and we came to the fact that no, we did not." Jones claimed that the only interaction between Tisckos and his former Galderma customers or territory was that Tisckos introduced two of his former customers in Beverly Hills to another Revance sales representative, and that he had contacted one customer who moved from Beverly Hills to Pasadena.

51.    These claims were false.  The truth is that Tisckos contacted many more than two of Galderma customers in Beverly Hills, including customers he had taken information from Galderma about, and he did so with Revance's knowledge and encouragement (meaning Revance could not have possibly thought Tisckos had only contacted two such customers when it testified under oath that that was the case). Documents released by Revance show Tisckos broadly communicating with clients in the Beverly Hills area on behalf of Revance and sharing information on how best to approach certain clients with Ryan Bruno, another salesperson at Revance.  After initially claiming he only contacted two of his former Galderma customers on behalf of Revance, Tisckos admitted the number of people he contacted could be over 50. He further admitted that he may have assisted other Revance salespeople in reaching out to Galderma's former customers.

52.    Jones also stated that Revance never had any discussions with Tisckos about Galderma's promotions, loyalty programs, or Collaborations.   ("Q. Any discussions about promotions at Galderma? A. No.  Q. Loyalty programs? A. No.")

53.    Again, that was false.  The truth is that Tisckos disclosed information on Galderma's ASPIRE program, contracts, and sampling practices to his supervisor, Mike Romagnoli ("Romagnoli"), who invited others in the Revance sales team group chat to join a conference call about "competitive intel on Galderma."  The express purpose of the call was to help Revance compete against Galderma using the information Tisckos was presenting.  In November 2022, after claiming for months that no such documents existed, Revance produced an April 13, 2021 email chain between Tisckos and his supervisor at Revance, Mike Romagnoli.  A true and correct copy of this email chain is attached as **Exhibit 3.**  In that email, Tisckos disclosed confidential and trade secret Galderma information to Revance.  He then gave a presentation to the Revance sales team on Galderma's confidential information, expressly for the purpose of helping Revance to compete against Galderma.

54.    On April 13, 2021, Romagnoli scheduled a meeting with Revance's sales team, noting "There will be some competitive intel on galderma u won't want to miss." That same day, Tisckos sent Romagnoli an email titled "Notes for todays [sic] call" in which he shared detailed and confidential information about Galderma's contracting process, sampling procedures, and promotional programs. *Id.*

55.    Galderma learned that Mr. Jones's claims about what work Tisckos was doing for Revance and what information he had shared with Revance were false in November 2022, when, in ongoing litigation between Galderma and Tisckos, Revance produced a series of text messages between Tisckos and his former Galderma customers, showing that Tisckos was actively soliciting and trying to sell Revance product to **numerous** former Galderma customers (not just two "introductions" as Revance had claimed), and in many cases was providing strategic information about the customers to Revance. Tisckos visited with many of the customers in person as well, attending trainings or other meetings on behalf of Revance. Tisckos continued producing such text messages on multiple subsequent occasions. As discussed above, many of the documents Tisckos took contained information on these customers, including detailed contact, sales and opportunity information.

56.    Tisckos further admitted that he retained Galderma information in several locations, including on devices (including a mobile phone) that he used for Revance-work purposes. Importantly, Tisckos admitted he kept all his Galderma contacts he had on his phone (which he had used for Galderma work purposes and then used for Revance work purposes). The information Tisckos stole included customers lists with detailed, customer-level information on the very customers Tisckos proceeded to help Revance try to usurp from Galderma.

57.    Revance encouraged and facilitated Tisckos' sharing of Galderma's confidential information. Revance gave Tisckos approval to share Galderma's information with its sales team, despite the fact that Revance knew or should have

known that Tisckos had obtained the information through improper means. Revance repeatedly made false statements about what Galderma information Tisckos shared with Revance and what work Tisckos was doing for Revance, showing that Revance knew it was wrongful for Tisckos to have shared that information and that Revance was trying to stop Galderma from learning what Tisckos was doing for Revance.

58.    At no point did Revance discipline Tisckos for the conduct identified above, nor did Revance take reasonable efforts to prohibit Tisckos from using Galderma's information. Rather, Revance tried to cover up Tisckos' misconduct through the false statements and other actions identified above.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

**Trade Secret Misappropriation Under the California Uniform Trade Secret Act (Cal. Civ. Code § 3426 *et seq.*)**

59.    Galderma realleges and incorporates by reference each and every allegation in the preceding paragraphs.

60.    Galderma owns and possesses trade secret information as set forth above, including documents containing confidential and valuable information regarding supply pricing, contract terms, product development plans, market pricing strategies, and sales plans.

61.    This information was created by Galderma at significant expense and developed over the course of many years.

62.    Galderma's trade secret information is highly valuable as a result of the efforts to keep the information confidential and out of the hands of third parties, and Galderma will suffer irreparable harm from the use and disclosure of its information, including loss of business and loss of competitive advantage.

63.    Galderma has taken reasonable steps to protect the secrecy of its trade secrets, as set forth above.

64.     Revance misappropriated Galderma's trade secrets in the improper and unlawful manner described above, for its own benefit and to harm Galderma. Revance committed this misconduct in part through its agent Tisckos, and then ratified his misconduct.

65.     Tisckos had no legitimate business reason to take these documents or to provide Galderma information to Revance.

66.     On information and belief, Tisckos will continue to misappropriate, disclose, and use for his benefit and the benefit of his new employer, and to Galderma's detriment, unless he is enjoined from doing so.

67.     On information and belief, Revance was aware of and encouraged Tisckos' misappropriation and/or accepted the benefits of Tisckos' misconduct. Revance failed to conduct an appropriate investigation or take other steps to ensure that Tisckos was not using Galderma's information in the course of performing his job duties for Revance.  Revance actively encouraged Tisckos to share confidential Galderma business strategies and information with numerous Revance salespeople during one or more conference calls.  Previously, Revance and Tisckos testified under oath that Tisckos had never discussed this Galderma information with Revance. Those statements were false and show that Revance knew Tisckos should not be sharing this information.  Revance gladly accepted the information anyway.

68.     Because Galderma's remedy at law is inadequate and it will suffer irreparable harm, Galderma' seeks—in addition to damages—a preliminary injunction and a permanent injunction to protect its confidential and trade secret information and legitimate business interests.  Galderma will continue to suffer irreparable harm absent injunctive relief.

69.     Defendant's misappropriation of Galderma's trade secret information has caused and will continue to cause Galderma substantial injury, including but not limited to actual damages, lost profits, harm to its reputation, and the diminution in

value of its trade secrets. Revance has also been unjustly enriched by its misappropriation of Galderma's trade secrets.

70.    Defendant's misappropriation of Galderma's trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive within the meaning of California Civil Code Section 3294. Defendant misappropriated Galderma's trade secrets intentionally and knowingly and with a deliberate intent to benefit itself and to injure Galderma. Galderma is entitled to damages, in an amount to be determined at trial, as well as injunctive relief, and an award of exemplary and/or treble damages and attorney's fees pursuant to California Civil Code Sections 3426.3(c) and 3426.4.

## SECOND CLAIM FOR RELIEF

### (Against All Defendants)

### Misappropriation Under the Defend Trade Secrets Act

### (18 U.S.C. § 1836 et seq.)

70.    Galderma realleges and incorporates by reference each and every allegation in the preceding paragraphs.

71.    Galderma owns and possesses trade secret information as set forth above, including documents containing confidential and valuable information regarding supply pricing, contract terms, product development plans, market pricing strategies, and sales plans.

72.    This information was created by Galderma at significant expense and developed over the course of many years.

73.    Galderma's trade secret information is highly valuable as a result of the efforts to keep the information confidential and out of the hands of third parties, and Galderma will suffer irreparable harm from the use and disclosure of its information, including loss of business and loss of competitive advantage.

74.    Galderma has taken reasonable steps to protect the secrecy of its trade secrets, as set forth above.

COMPLAINT

75.    Revance misappropriated Galderma's trade secrets in the improper and unlawful manner described above, for its own benefit and to harm Galderma. Revance committed this misconduct in part through its agent Tisckos, and then ratified his misconduct.

76.    Tisckos had no legitimate business reason to take these documents or to provide Galderma information to Revance.

77.    On information and belief, Tisckos will continue to misappropriate, disclose, and use for his benefit and the benefit of his new employer, and to Galderma's detriment, unless he is enjoined from doing so.

78.    On information and belief, Revance was aware of and encouraged Tisckos' misappropriation and/or accepted the benefits of Tisckos' misconduct. Revance failed to conduct an appropriate investigation or take other steps to ensure that Tisckos was not using Galderma's information in the course of performing his job duties for Revance.  Revance actively encouraged Tisckos to share confidential Galderma business strategies and information with numerous Revance salespeople during one or more conference calls.  Previously, Revance and Tisckos testified under oath that Tisckos had never discussed this Galderma information with Revance. Those statements were false and show that Revance knew Tisckos should not be sharing this information.  Revance gladly accepted the information anyway.

79.    Because Galderma's remedy at law is inadequate and it will suffer irreparable harm, Galderma' seeks—in addition to damages—a preliminary injunction and a permanent injunction to protect its confidential and trade secret information and legitimate business interests.  Galderma will continue to suffer irreparable harm absent injunctive relief.

80.    Defendant's misappropriation of Galderma's trade secret information has caused and will continue to cause Galderma substantial injury, including but not limited to actual damages, lost profits, harm to its reputation, and the diminution in

value of its trade secrets.    Revance has also been unjustly enriched by its misappropriation of Galderma's trade secrets.

81.    Defendant's misappropriation of Galderma's trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive, within the meaning of the DTSA, 18 U.S.C. § 1836(b)(3)(C)-(D).  Defendant misappropriated Galderma's trade secrets intentionally and knowingly and with a deliberate intent to benefit itself and to injure Galderma.  Galderma is entitled to damages, in an amount to be determined at trial, as well as injunctive relief, and an award of exemplary and/or treble damages and attorney's fees pursuant to the DTSA.

## THIRD CLAIM FOR RELIEF

### Inducing Breach of Contract

82.    Galderma realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

83.    As set forth above, Tisckos owed contractual duties to Galderma not to use, disclose, retain, or delete Galderma information, and an affirmative duty to return Galderma information.  Tisckos breached these duties.

84.    Revance knew of Tisckos' contractual duties to Galderma.

85.    Revance intended for Tisckos to breach his contractual duties to Galderma so that Revance could obtain the benefit of Galderma's information.

86.    Revance's conduct, including its recruitment of Tisckos, was intended to cause Tisckos to breach his contractual obligations to Galderma.

87.    As a direct and proximate result of Tisckos' breaches, and Revance's inducement of that breach, Galderma has suffered damages, in an amount to be proven at trial.  Further, Galderma does not have an adequate remedy at law and will not be fully compensated for Revance's misconduct without injunctive relief.

//

COMPLAINT

## FOURTH CLAIM FOR RELIEF

### Interference with Contractual Relations

88.    Galderma realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

89.    As set forth above, Tisckos owed contractual duties to Galderma not to use, disclose, retain, or delete Galderma information, and an affirmative duty to return Galderma information.  Tisckos breached these duties.

90.    Revance knew of Tisckos' contractual duties to Galderma.

91.    Revance intended for Tisckos to breach his contractual duties to Galderma so that Revance could obtain the benefit of Galderma's information and so that Galderma would not obtain the benefits of its contract with Tisckos.

92.    Revance's conduct, including its recruitment of Tisckos, was intended to cause Tisckos to breach his contractual obligations to Galderma.

93.    As a direct and proximate result of Tisckos' breaches, and Revance's inducement of that breach, Galderma has suffered damages, in an amount to be proven at trial.  Further, Galderma does not have an adequate remedy at law and will not be fully compensated for Revance's misconduct without injunctive relief.

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting in Computer Crimes in Violation of California Penal Code § 502(c)

94.    Galderma realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

95.    Penal Code Section 502(c) makes it a crime, for which there is a civil remedy, where, as here, a person:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

28

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network….")

96.    Penal Code § 502(c) also prohibits the unauthorized use or access of any computer, computer system, or network.  Cal. Penal Code §§ 502(c)(3), 502(c)(7).

97.    Tisckos engaged in criminal acts in violation of California Penal Code, Section 502 by deleting information from his Galderma Laptop computer and by accessing and taking Galderma data using the Galderma Laptop after his employment had ended and his access to Galderma's systems had been terminated on April 1, 2021.

98.    Revance knew or should have known that Tisckos was committing this misconduct in violation of Penal Code Section 502(c) and Revance gave substantial assistance to Tisckos to accomplish this misconduct, including by falsely claiming to Galderma that it had performed a thorough investigation and verified that Tisckos did not have, use, or disclose Galderma information, and by falsely claiming that Tisckos did not work with his former Galderma customers.  Likewise, Revance provided substantial assistance to Tisckos to violate Penal Code Section 502(c) by providing him with devices and access to cloud-based storage at the same time Tisckos was in possession of Galderma's electronic storage devices, and allowing him to use the smart phone that he had used as an employee of Galderma without first ensuring that Tisckos had not used that device, without authorization, to download, copy, or otherwise delete Galderma's confidential information.

COMPLAINT

99.    Revance's conduct was a substantial factor in causing the harm to Galderma.

100.    This claim is not predicated on the misappropriation or theft of any confidential, proprietary and/or trade secret information belonging to Galderma, but rather on the independently improper actions described above, including Tisckos' deletion of information off Galderma' computer systems.

101.    As a consequence, Galderma has been harmed, and Galderma has sustained damages in an amount to be proven at trial.  Defendants' acts and conduct that constitute the commission of these computer crimes were carried out willfully, fraudulently, maliciously, and with a wanton disregard of Galderma's rights, thereby entitling Galderma to punitive damages to be proven at trial.

102.    Galderma also has suffered irreparable harm as a result of Defendants' activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Tisckos is enjoined from engaging in any further such acts.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Galderma prays for judgment in its favor and against Defendants Tisckos and Revance, as follows:

1.  For compensatory damages, according to proof;

2.  For exemplary and punitive damages, including damages and/or reasonable royalty awardable under the UTSA Section 3426.3, according to proof;

3.  For injunctive relief;

4.  For restitution and/or disgorgement of profits;

5.  For attorney fees pursuant to Penal Code Section 502(c)(e)(2) and pursuant to Cal. Civ. Code Section 3426.4 and 18 U.S.C.§ 1836(b)(3)(D)

6.  For costs of suit incurred herein;

7.  For a trial by jury; and

8.  For such other and further relief as the Court may deem proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury of all causes of action so triable.

Dated:        April 17, 2023

LITTLER MENDELSON P.C.


*/s/ Mark A. Romeo*
Mark A. Romeo
Derek S. Hecht
Ariën Koorn

Attorneys for Plaintiff
GALDERMA LABORATORIES, L.P.

31

COMPLAINT